**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| 42nd and 10th Hotel, LLC,<br><br>　　　　　Petitioner,<br><br>　　v.<br><br>New York Hotel & Motel Trades Council,<br>AFL-CIO,<br><br>　　　　　Respondent. | Civil Action No. 1:21-cv-6250 |

## MEMORANDUM OF LAW IN SUPPORT OF PETITION AND MOTION TO VACATE THE ARBITRATION AWARD

Fairness requires that both parties to a bargained-for agreement receive the benefit of their bargained-for rights and that the arbitrator is bound to enforce all the terms of the parties' agreement. In the collective bargaining agreement between Petitioner 42nd and 10th Hotel, LLC ("Hotel" or "Yotel") and Respondent New York Hotel & Motel Trades Council, AFL-CIO ("Union"), one of the fundamental bargained-for rights of the employer is the right to lay off or transfer any employee. Without this right, the employer would be hamstrung in its ability to operate a viable business, which ultimately harms both the employer and the employees. Recognizing as much, the Supreme Court has repeatedly affirmed the importance of the employer's prerogative to run a profitable business, which includes the management right to align its operations according to its business objectives. The parties' agreement here expressly protected Yotel's management rights to transfer or lay off employees.

Nevertheless, the arbitrator here gave short shrift to the precedent, policy ramifications, and plain language of the parties' agreement protecting Yotel's management rights to transfer or lay off any employee. The arbitrator held that Yotel must employ fourteen employees in the Ground Control department even though the work performed by the Ground Control department has been significantly curtailed. To reach that absurd result, the arbitrator interpreted a single provision of a supplementary agreement in a vacuum. This

1

provision though makes no sense even on its own terms because the arbitrator's construction of it is inconsistent with the parties' past practices, which recognized that Yotel could employ fewer than a fourteen-person complement of employees in the Ground Control department. When presented with facts that the employees Yotel laid off would be performing no work whatsoever if rehired, the arbitrator made no contrary factual finding and even admitted that forcing Yotel to hire fourteen Ground Control employees would create "financial hardship" for Yotel. In reaching this result, the arbitrator exceeded his authority, ignored the essence of the parties' agreement, and violated fundamental principles of contract interpretation. The Award should be vacated.

**Background**

42nd and 10th Hotel, LLC ("Hotel" or "Yotel") is a hotel located less than a mile from Times Square that features a technology-focused brand, where guests use self-service kiosks for check-in and check-out. Guests can also check baggage using "Yobot," which is a giant robotic arm that picks up guests' baggage and places the baggage in storage containers that guests can then access later by scanning the barcode on their baggage check receipt. Yotel started in Europe, and the Hotel opened in New York in 2010.

Although its brand is centered on tech-savvy self-serve options, Yotel also offers in-person support for those who prefer not to use a kiosk. These guests can head to Mission Control, which is located on the fourth floor and where employees provide traditional front desk services. When the Hotel opened, it also employed a team of Ground Control employees on the ground floor where the self-service kiosks are located. The primary responsibilities of Ground Control employees included assisting guests using the kiosks, helping guests bring luggage to their rooms, and performing common bell and doorman functions, such as assisting guests with hailing cabs. And when "Yobot" was at capacity, Ground Control employees also provided additional baggage storage options. Traditional baggage storage options were available for an automatic fee until 2016 when Yotel opted for a suggested gratuity instead.

Yotel is bound by the Industry Wide Collective Bargaining Agreement ("IWA"). Among key provisions negotiated between hotels and unions, the IWA provides that "[t]he Employer shall have the right to direct and control its employees. The Employer shall have the right to lay off, promote, or transfer any employee…" Declaration of Mark W. DeLaquil ("DeLaquil Decl."), Ex. 2, at 31.[1] In the 2011 Memorandum of Understanding ("MOU"), Yotel and the Union supplemented the IWA and agreed that "[n]otwithstanding the prohibition on combination jobs that cross bold headings, Ground Control employees shall continue to perform the duties of Guest Service Agent (i.e., assist guests with check in kiosks and automated luggage machine), Doorperson and Bellperson. The Hotel shall continue the current practice of tip sharing and pooling. Ground Control Employees shall be paid in the same manner as Doorpersons for purposes of paid days off." DeLaquil Decl., Ex. 5.

In 2016, when the automatic fee for traditional baggage storage was replaced with a suggested gratuity for Ground Control, Yotel and the Union entered into the 2016 Baggage Storage Agreement ("2016 Agreement"). DeLaquil Decl., Ex. 4. Key among the provisions in that agreement is Paragraph 4, which provides that "[e]ffective immediately, the Hotel may eliminate the 15th Ground Control position and need only maintain a complement of fourteen (14) Ground Control employees on its payroll at any time." DeLaquil Decl., Ex. 4. In the years following this agreement, two Ground Control employees left Yotel. Those employees were not replaced, and the Union never objected in that time to the decrease in Ground Control employees.

In the decade of technological development that occurred between 2010 when Yotel was launched and 2020, the demand for service from Ground Control employees steadily declined due to a confluence of factors that included guests becoming accustomed to using self-service kiosks[2], application based ride-sharing services such as Uber and Lyft negating

---

[1] Page numbers refer to PDF pagination, not the internal pagination of the document.

[2] In 2010, a kiosk at a grocery store was a phenomenon. Today, self-service checkout is an ordinary part of the shopping experience.

any reason for bell or doormen to assist guests with securing taxis, rising airline baggage fees causing travelers to carry less luggage, and improved rollaway luggage that guests can transport with minimal assistance. Because of the decline in work for Ground Control employees, Yotel informed the Union on March 3, 2020 that it would no longer be providing bell or door services and that Mission Control employees from the fourth floor would be relocated to the ground floor to assist guests checking in and out of the Hotel, although Mission Control employees would not be assisting at all with handling baggage. Consistent with this operational change reflecting guest preferences and the trend of the hospitality industry, Yotel informed the Union that it also planned to exercise its employer's prerogative in Article 22 of the IWA to lay off ten of its twelve Ground Control employees. In March 2020, the Union filed a grievance, arguing for the first time that Paragraph 4 of the 2016 Agreement required Yotel to employ fourteen Ground Control employees at all times. DeLaquil Decl., Ex. 1, at 13.

And then COVID-19 hit. The hearing scheduled for March 19 on the Union's grievance was adjourned. By March 29, Yotel shuttered its doors and temporarily closed its business. Yotel did not reopen to transient guests until nearly a year later on January 8, 2021. For a brief time from April 2020 through May 2020, Yotel lodged first responders and medical personnel to aid in combatting the pandemic. When the Hotel reopened in January 2021 for transient guests, it recalled other bargaining unit employees laid off because of COVID-19 but it did not recall any Ground Control employees because it was no longer offering services performed by the Ground Control Department. Indeed, since shuttering its doors on March 29, 2020, Yotel has not offered any bell or door services. Nor do guests—wary of close contact with strangers—desire those services. And because guests must complete New York's required "Traveler Health Form," the kiosks were not being used. Mission Control has been relocated to the ground level to streamline the guest check in experience.[3] In addition, even

---

[3] With lessening traveling restrictions and the pandemic subsiding, the kiosks became operational on May 17, 2021.

after reopening to transient guests, Yotel's occupancy rate (the number of rooms filled) is nowhere near pre-COVID-19 levels. Yotel's occupancy hovered around 3% in January 2021 and only barely increased to 5% in February. DeLaquil Decl., Ex. 1, at 10.

On April 30, 2021, the Impartial Chairperson ("IC") issued its arbitration award, largely accepting the Union's arguments that Yotel violated the 2016 Agreement when it "re-opened in April-May 2020 to house medical personnel" and then when it reopened "in January 2021 for transient business without recalling and maintaining a complement of fourteen (14) Ground Control employees." DeLaquil Decl., Ex. 1, at 2–3. The IC concluded that Paragraph 4 of the 2016 Agreement required Yotel to maintain fourteen Ground Control employees at all times, despite recognizing that "[t]here is no question that Article 22 of the IWA affords an employer the right to institute layoffs." DeLaquil Decl., Ex. 1, at 17. The IC further found that recalling fourteen Ground Control employees to provide services the Hotel discontinued would create "financial hardship [for] the Employer…, particularly in this pandemic-shackled economy," and "that arbitrators should avoid harsh or, worse, absurd results…where the language under scrutiny is ambiguous." DeLaquil Decl., Ex. 1, at 17–18.

### Argument

Yotel challenges the Award because the IC exceeded his authority under the IWA and entered an award subject to vacatur under both the Federal Arbitration Act ("FAA") and the Labor Management Relations Act ("LMRA"). The Arbitration Award should be vacated. *See Matteson v. Ryder Sys. Inc.*, 99 F.3d 108, 113 (3d Cir. 1996) ("[C]ourts are neither entitled nor encouraged simply to 'rubber stamp' the interpretations and decisions of arbitrators.").

### I.     The IC Exceeded His Powers Under the IWA in Violation of the FAA

Vacatur is required when arbitrators "exceeded their powers" under the arbitration agreement. 9 U.S.C. § 10(a)(4). To determine if an award violates Section 10(a)(4), a court examines "whether the arbitrators had the power, based on…the arbitration agreement, to reach a certain issue…." *Fellus v. Sterne, Agee & Leach, Inc.*, 783 F. Supp. 2d 612, 618 (S.D.N.Y. 2011) (citations omitted). When an award contradicts the plain language of the collective bar-

5

gaining agreement, the arbitrator goes "beyond the scope of his authority" and the award must be vacated. *See Matter of Arbitration Between Melun Indus., Inc. & Strange*, 898 F. Supp. 990, 993 (S.D.N.Y. 1990).

A.      The IC's decision ignores the plain language of the provisions on management rights in the IWA. Article 22 of the IWA, which is identified under the bold heading "**MANAGEMENT RIGHTS**," provides Yotel with "the right to lay off, promote, or transfer any employee." IWA Art. 22. Following on the heels of Article 22, Article 23 of the IWA explains the procedures for layoffs, recall, and rehire. In particular, Article 23(B)(1) provides that "*in the event of rehiring*, [the Employer] shall give preference to the persons on said list [of laid off employees] in order of seniority, provided that it *shall not be required to rehire any person* from said list unless such person, before being laid off, *performed identical tasks in the same department* from which s/he was laid off." IWA Art. 23(B)(1) (emphasis added).

The IC's decision is contrary to these provisions. To begin with, Article 22 broadly provides that employers have the right to "lay off" and "transfer" any employee. This provision comports with well-established law protecting employers' rights in managing their business. Known as the "management prerogative," the Supreme Court has explained that "[m]anagement must be free from the constraints of the bargaining process to the extent essential for the running of a profitable business." *First Nat. Maint. Corp. v. NLRB*, 452 U.S. 666, 678–79 (1981). And "there are [] areas where decisions by management may quite clearly imperil job security, or indeed terminate employment entirely. An enterprise may decide to invest in labor-saving machinery. Another may resolve to liquidate its assets and go out of business. Nothing the Court holds today should be understood as imposing a duty to bargain collectively regarding such managerial decisions, which lie at the core of entrepreneurial control. Decisions concerning the commitment of investment capital and the basic scope of the enterprise are not in themselves primarily about conditions of employment, though the effect of the decision may be necessarily to terminate employment." *Fibreboard Paper Prod. Corp. v. NLRB*, 379 U.S. 203, 223 (1964) (Stewart, J., concurring); *NLRB v. Royal Plating &*

*Polishing Co.*, 350 F.2d 191, 196 (3d Cir. 1965) ("[A]n employer faced with the economic necessity of either moving or *consolidating the operations* of a failing business has no duty to bargain with the union respecting its decision to shut down.") (emphasis added).

Recognizing the management prerogative to operate a viable business, district courts in similar factual circumstances to this case have vacated arbitration awards where the IC's decision ignores the plain language of management rights in the collective bargaining agreement. In *Boardwalk Regency Corp. v. Unite Here Loc. 54*, No. CIV.08-0016(JBS), 2009 WL 540675, at *6 (D.N.J. Mar. 3, 2009), the district court vacated an arbitration award because "the Arbitrator's conclusion that [the employer] unilaterally terminated the MOU by ceasing to assign doormen to load and unload buses cannot be supported by the plain language of the collective bargaining agreement. As [employer] argues, that 'plain language' makes clear that it was within the Employer's right to assign doormen to load and unload buses, or not to so assign them, as its needs dictated." *Id.* at *6. Similarly, in *Sterling Fluid Sys. (USA), Inc. v. Chauffeurs, Teamsters & Helpers Loc. Union #7, Affiliated with the Int'l Bhd. of Teamsters*, 322 F. Supp. 2d 837, 840 (W.D. Mich. 2004), the district court vacated an arbitration award holding that the employer violated the collective bargaining agreement when it reassigned work to another facility and shut down a plant. The court held that "a company's decision to shut down a plant comprises a classic management decision" and the arbitrator exceeded his powers in "analyz[ing] the plant shutdown under the Subcontracting Clause, rather than under the Management Rights Clause." *Id.*

So too here. The IC exceeded his powers in analyzing this case under Paragraph 4 of the 2016 Agreement instead of under the Management Rights provisions in the IWA. It's black-letter law that courts "do not interpret contracts in a vacuum but rather in their entirety." *Miller v. Hekimian Lab'ys, Inc.*, 257 F. Supp. 2d 506, 516 (N.D.N.Y. 2003), *aff'd*, 85 F. App'x 266 (2d Cir. 2004). "A written contract will be read as a whole, every part will be interpreted with reference to the whole, and if possible it will be so interpreted as to give effect to its general purpose." *Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. v. Am. Boat Co., LLC*,

No. 11 CIV. 6804 PAE, 2012 WL 527209, at *4 (S.D.N.Y. Feb. 17, 2012) (cleaned up). And there is no doubt that the IC recognized that the parties' agreement protected Yotel's management rights. As the IC wrote, "There is no question that…the IWA affords an employer the right to institute layoffs." Ex. 1, at 17.

The provisions on Management Rights contain express language providing Yotel the right to lay off the Ground Control employees and discontinue the tasks performed by those employees. First, there is the broad provision in Article 22 stating unambiguously that Yotel can "lay off" or "transfer" "*any* employee." This provision is meaningless under the IC's decision. Second, Article 23(B)(1) specifically recognizes that when employees are laid off, there is no guarantee of rehiring. The first clause expressly identifies rehire as conditional: "in the event of rehiring." *See Ginett v. Computer Task Grp.*, Inc., 962 F.2d 1085, 1100 (2d Cir. 1992) ("Parties often use language such as 'if,' 'on condition that,' 'provided that,' 'in the event that,' and 'subject to' to make an event a condition."). To drive home the employer's bargained-for right not to rehire, Article 23(B)(1) reiterates that the employer "shall not be required to rehire any person." Only after making clear that rehiring is conditional and the employer is not required to rehire any employee, the IWA provides that **if** the employer chooses to rehire, then it must rehire laid off employees in order of seniority for any job classification where the rehired employee would be performing "identical tasks in the same department" to those performed before being laid off. All these provisions make clear that the IC exceeded his powers in analyzing Yotel's decision not to recall any Ground Control employees under Paragraph 4 of the 2016 Agreement instead of the Management Rights provisions of the IWA.

This case is just like *Sterling*. There, the arbitrator analyzed the employer's decision to close a plant and reassign work to another plant under the subcontracting provision instead of the management rights provisions, and the court vacated the arbitrator's decision and explained that the arbitrator exceeded his powers in "[a]ssuming at the outset that closing the PMC facility constituted subcontracting," and "analyz[ing] whether this purported

subcontracting complied with the CBA's restrictions on subcontracting" because closing a plant is a management prerogative and the arbitrator "impermissibly disregarded the express terms of the Management Rights Clause and consequently rendered a decision not rationally supported by the CBA." *Sterling*, 322 F. Supp. 2d at 845, 847.

As in *Sterling*, the IC jumped right to Paragraph 4 of the 2016 Agreement without analyzing whether the Management Rights provisions control the outcome of this proceeding. And only after analyzing Paragraph 4 in a vacuum did the IC make a passing reference to the Management Rights provisions in the IWA. In doing so, the IC exceeded his powers because Yotel has a management prerogative to determine what services to offer its guests, and to lay off employees and not rehire them when it's discontinuing the tasks performed by those employees. That is exactly what happened here. Due to lack of demand, Yotel chose to stop providing the vast majority of services performed by its Ground Control department, such as bringing luggage to guest rooms, providing bag storage to supplement the Yobot, and offering doorman functions. None of these tasks previously performed by Ground Control employees are currently offered by Yotel, and this fact is undisputed. *See* DeLaquil Decl., Ex. 1, at 5 ("It is also undisputed, however, that the Hotel did not and has not recalled any Ground Control employees") and at 13 ("The Hotel is not offering any bell or door services to guests and has no intention of doing so in the future.").

Yotel acted well within its bargained-for rights in discontinuing the functions provided by Ground Control employees and not rehiring any of them after being laid off. The IC's decision that Yotel "must maintain a complement of 14 Ground Controllers on its payroll at any time," DeLaquil Decl., Ex. 1, at 18, is contrary to the plain language of the parties' agreement and therefore must be vacated.

B.      The IC's interpretation of Paragraph 4 of the 2016 Agreement is also wrong on its own terms. For the reasons explained above, the IWA protects Yotel's right to close or significantly decrease the level of services offered by the Ground Control department, so the subsidiary question of whether Paragraph 4 sets a ceiling or a floor on how many Ground

Control employees must be employed should not even be considered in this proceeding.[4] But even on this point, the IC exceeded his powers in holding that Paragraph 4 sets a floor on the minimum number of Ground Control employees that must be on Yotel's payroll.

First, there is an unmistakable conflict between Paragraph 4 of the 2016 Agreement and the Management Rights provisions in the IWA. The IC found that "[t]here is no question that Article 22 of the IWA affords an employer the right to institute layoffs," yet also—and inconsistently—found that "the Hotel must maintain a complement of 14 Ground Controllers on its payroll at any time." Ex. 1, at 17–18. To be clear, the IC's attempt to construe Paragraph 4 in a vacuum on the theory that the provision was plain and unambiguous violated fundamental rules of contract interpretation: "The rules of contract interpretation…do not contemplate considering any provision of the contract in isolation.'" *U.S. ex rel. Anti-Discrimination Ctr. of Metro New York, Inc. v. Westchester Cty., N.Y.*, 712 F.3d 761, 767 (2d Cir. 2013); *see also* 17A C.J.S. Contracts § 416 ("A contract must be interpreted or considered as a whole, or in its entirety. The parties' intention is to be ascertained from the entire contract, and not from isolated words, phrases, or provisions."). In other words, the IC could not interpret Paragraph 4 in a vacuum, especially after recognizing the inconsistency between Paragraph 4 and the Management Rights provisions.

In the face of such conflict between contract provisions, "cannons of contract construction require that where two contract provisions appear inconsistent…a Court should seek to reconcile them and to give them both effect." *Frere v. Orthofix, Inc.*, No. 00CIV.1968 (RMB)(MHD), 2002 WL 1543857, at *4 (S.D.N.Y. July 15, 2002), *aff'd*, 92 F. App'x 832 (2d Cir. 2004) (recognizing that contract law requires arbitrators to resolve inconsistencies); *Major League Umpires Ass'n v. Am. League of Pro. Baseball Clubs*, 357 F.3d 272, 280 (3d Cir. 2004) ("Manifest disregard for the CBA is established when the arbitrator's award is totally

---

[4] The 2016 Agreement was negotiated in conjunction with the Hotel shifting to suggested gratuity instead of an automatic fee for bag storage. It was clearly premised on the assumption that the Hotel would maintain a viable Ground Control Department.

unsupported by principles of contract construction.") (cleaned up). And such an interpretation is readily apparent: if Yotel chooses to maintain a Ground Control department it "need only maintain a complement of" fourteen employees, but Article 22 protects its management prerogative to reorganize operations and eliminate the Ground Control department entirely.

Second, the arbitrator inexplicably ignored historical practices when interpreting Paragraph 4, and those practices are especially relevant when the contract is internally inconsistent. "'It is well settled that the arbitrator may look beyond the terms of the agreement for guidance and may interpret the CBA in light of the parties' intent revealed through bargaining history, past practices, rights established under earlier agreements, and other rudimentary sources of contract construction.'" *Otis Elevator Co. v. Loc. 1, Int'l Union of Elevator Constructors*, No. 03 CIV. 8862 (DAB), 2005 WL 2385849, at *6 (S.D.N.Y. Sept. 23, 2005) (quoting *Loc. 1199, Drug, Hosp. & Health Care Emps. Union, RWDSU, AFL-CIO v. Brooks Drug Co.*, 956 F.2d 22, 25 (2d Cir. 1992)). As the Supreme Court has recognized, "The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it." *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581–82 (1960). To that end, the arbitrator recognized that if Yotel "had an unfettered right to reduce its Ground Control staff," then it would be factually relevant if Yotel "acted consistent with its view…after the codification of the 2016 Agreement." DeLaquil Decl., Ex. 1, at 17. But the arbitrator gives away the game with that recognition because it is undisputed that Yotel did in fact act consistent with its view that it could employ fewer than fourteen Ground Control employees without violating Paragraph 4.

There were several years after the 2016 Agreement and before Ground Control operations were discontinued where Yotel did not employ a complement of fourteen Ground Control employees—and the Union never objected during that time. Between April 2018 and February 2020, the number of Ground Control employees dwindled down to twelve, and Yotel never replaced the employees who left. In other words, Yotel acted consistent with its

view that Paragraph 4 did not require it to employ a minimum of fourteen Ground Control employees. But despite recognizing that this bargaining history would be relevant to whether Yotel had an unfettered right under Paragraph 4 to employ fewer than fourteen Ground Control employees, the IC ignored the undisputed fact that Yotel actually employed fewer than fourteen Ground Control employees for multiple years following the 2016 Agreement. Because the Award went "beyond the self-limiting agreement between consenting parties, [the IC] act[ed] inherently without power," and therefore the award "must be vacated." *Porzig v. Dresdner, Kleinwort, Benson, N.A.*, 497 F.3d 133, 140 (2d Cir. 2007).

Here, the IC never reconciled the inconsistency between these provisions or the inconsistency with practice practices. To the contrary, the IC's interpretation of Paragraph 4 is both inconsistent with the bargained-for Management Right provisions and also with the parties' past practices in interpreting Paragraph 4. Arbitration "is a matter of consent, not of coercion," *Keymer v. Management Recruiters International, Inc.*, 169 F.3d 501, 504 (8th Cir. 1999), and Yotel never consented to granting the IC sweeping power to "undertak[e] a fundamental revision" of the parties' agreement, *Melun Industries*, 898 F. Supp. at 994. The arbitration award should be vacated.

## II.     The Arbitrator Did Not Draw His Award from the "Essence" of the IWA and Therefore the Award Violates the LMRA

Because this Award is a labor arbitration award, it is subject to review under Section 301(a) of the Labor Management Relations Act. 29 U.S.C. § 185(a). The Supreme Court has long required that "an arbitrator's award settling a dispute with respect to the interpretation or application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987). An arbitration award is "legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).

Here, for the reasons described above, rough "industrial justice" is the only possible interpretation of the IC's award. Rather than interpret and apply the IWA, the Award "completely ignored," *Local 814, Intern. Broth. Of Teamsters, Chauffeurs, Warehousemen, and Helpers of America v. Sotherby's Inc.*, 665 F. Supp. 1089, 1093 (S.D.N.Y. 1987), the IWA's terms to reach a result that the IC regarded as fair, notwithstanding that this result actually conflicts with the IWA's express provisions protecting Management Rights. The resulting Award therefore does not draw its essence from the IWA, and so must be vacated. *See Sterling Fluid Sys. (USA), Inc. v. Chauffeurs, Teamsters & Helpers Loc. Union No. 7*, 144 F. App'x 457, 463 (6th Cir. 2005) ("[T]he arbitrator's decision failed to draw its essence from the CBA because it disregarded the plain language of the CBA's management rights clause."); *Citgo Asphalt Ref. Co. v. Paper, Allied-Indus., Chem. & Energy Workers Int'l Union Loc. No. 2-991*, 385 F.3d 809, 820 (3d Cir. 2004) (vacating arbitration award where arbitrator imposed his view of fairness instead of the terms of the "management rights" provisions in the CBA); *Lourdes Med. Ctr. of Burlington Co. v. JNESO*, No. CIV.A. 04-4494 (JCL), 2007 WL 1040961, at *10 (D.N.J. Apr. 5, 2007) (holding that an award did not draw its essence from the CBA because the arbitrator "ignored the contract provision defining 'layoff,' and wrote in his own.").

### III.    The IC's Award Is Commercially Unreasonable And Creates Absurd Results

"It is black-letter law that courts must reject interpretations of agreement provisions that are commercially unreasonable or illogical." *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 173 (S.D.N.Y. 2015). A "contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." *Greenwich Cap. Fin. Prod., Inc. v. Negrin*, 903 N.Y.S.2d 346, 348 (N.Y. App. Div. 2010). To the contrary, contracts "should be examined in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes." *Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986).

In its briefing before the IC, Yotel wrote that "[a] nominal occupancy means there is *no work whatsoever* for Ground Control employees to perform and, therefore, the department is closed" and that "[t]he Hotel is not offering any bell or door services to guests and has no intention of doing so in the future." DeLaquil Decl., Ex. 1, at 16, 13 (emphasis added). The IC acknowledged that "there is little factual dispute [in this proceeding] and, where there is, the Arbitrator will make appropriate findings." DeLaquil Decl., Ex. 1, at 2. On the fact that Ground Control employees had no work whatsoever to perform, the IC did not make any contrary factual finding. In fact, the IC expressly acknowledged that it "certainly appreciates the financial hardship befalling the Employer…particularly in this pandemic-shackled economy." DeLaquil Decl., Ex. 1, at 17–18.

The IC's interpretation of Paragraph 4 is commercially unreasonable and irrational because it requires Yotel to employ fourteen people after implicitly finding—as an undisputed fact—that those people would have no work whatsoever to perform. *See Shipping & Fin., Ltd. v. Aneri Jewels LLC*, No. 19 CIV. 1293 (NRB), 2019 WL 5306979, at *3 (S.D.N.Y. Oct. 21, 2019) (recognizing that "an interpretation" is commercially unreasonable when it "would eviscerate 'the business purposes sought to be achieved' through the Agreement"). "It is a longstanding principle of New York law that a construction of a contract that would give one party an unfair and unreasonable advantage over the other, or that would place one party at the mercy of the other, should, if at all possible, be avoided." *ERC 16W Ltd. P'ship v. Xanadu Mezz Holdings LLC*, 943 N.Y.S.2d 493, 498 (N.Y. App. Div. 2012). If requiring an employer to hire a team of workers with nothing to do is not commercially unreasonable, then the phrase "commercially unreasonable" means nothing. Put differently, the basic premise of any contract is that there is a bargained-for exchange of consideration. In a collective bargaining agreement it is axiomatic that labor and management negotiate over wages for work being performed. There is no consideration on labor's side if employees are getting paid to not perform any work for the employer. Interpreting the contract to such a result, as the IC did, is absurd. More than that, the IC expressly recognized that the financial hardship to Yotel is

especially pronounced "in this pandemic-shackled economy."[5] For these reasons, the Award should be vacated as contrary to fundamental principles of contract interpretation.

The commercially reasonable interpretation of the parties' agreement—and the one that reconciles and gives meaning to every provision of the agreement—is that Yotel has the right to lay off employees, per its bargained-for right under Article 22 of the IWA, and is not required to rehire those employees, per its bargained-for right under Article 23. And Paragraph 4 has no application at all under these circumstances because the services the Ground Control department offers have been drastically curtailed. The IC's decision exceeds the arbitrator's authority, does not draw its essence from the parties' agreement, and violates fundamental principles of contract interpretation.

## Conclusion

Petitioner respectfully requests that the Court vacate the Award.

---

[5] The financial impact to Yotel cannot be overstated given the dire state of the hospitality industry in New York City. *See* Mary K. Jacob, *NYC faces crisis of empty hotels amid COVID pandemic*, N.Y. Post (Mar. 9, 2021). In the wake of COVID-19, around 200 of the city's 700 hotels have shuttered their doors—some permanently—and the Office of the New York State Comptroller expects that the hotel industry "is not expected to fully recover to pre-pandemic levels until 2025." *The Tourism Industry in New York City: Reigniting the Return*, Office of the New York State Comptroller (April 2021).

Dated: July 22, 2021

Respectfully Submitted,

/s/ Paul Rosenberg

PAUL ROSENBERG
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, N.Y. 10111
(212) 589-4299 (phone)
(212) 589-4201 (fax)
prosenberg@bakerlaw.com

MARK W. DELAQUIL*
RENEE M. KNUDSEN*
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
(202) 861-1527 (phone)
(202) 861-1783 (fax)
mdelaquil@bakerlaw.com
rknudsen@bakerlaw.com

*Attorneys for Petitioner*

*Pro hac vice* applications forthcoming.

**Addendum**

**Industry Wide Collective Bargaining Agreement, Article 22**

(A) The EMPLOYER shall have the right to direct and control its employees. The EMPLOYER shall have the right to lay off, promote, or transfer any employee. Promotions shall not be subject to contest or review. The UNION shall, by representatives designated by it, have the right to confer with the EMPLOYER on behalf of any laid off or transferred employee. If the UNION claims that a layoff or transfer results in any abuse of the rights of employees, the grievance shall be subject to the grievance and arbitration provisions of Article 26 of this Agreement.

…

**Industry Wide Collective Bargaining Agreement, Article 23**

…

(B) Layoff – Recall

(1) The EMPLOYER shall keep a list of names of all employees laid off during the term of this Agreement and shall furnish the UNION with a copy thereof; and in the event of rehiring, it shall give preference to the persons on said list in order of seniority, provided that it shall not be required to rehire any person from said list unless such person, before being laid off, performed identical tasks in the same department from which s/he was laid off.

…

**2016 Baggage Storage Agreement, ¶ 4**

Effective immediately, the Hotel may eliminate the 15th Ground Control position and need only maintain a complement of fourteen (14) Ground Control employees on its payroll at any time.